774 So.2d 200 (2000)
Betty R. JONES, Plaintiff-Appellee,
v.
SUPER ONE FOODS/BROOKSHIRES GROCERY COMPANY and The Hartford Insurance Company, Defendants-Appellants.
No. 33,683-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 2000.
*202 Theus, Grisham, Davis & Leigh by Sharon I. Marchman, Monroe, Counsel for Defendants-Appellants.
Ross Law Firm by James E. Ross, Jr., Counsel for Plaintiff-Appellee.
Before NORRIS, WILLIAMS and STEWART, JJ.
NORRIS, Chief Judge.
The trial court awarded plaintiff, Betty Jones, $4,000.00 for damages she sustained as the result of a slip-and-fall at a Super One grocery store owned and operated by defendant, Brookshire Grocery Company. For the reasons expressed below, we affirm.

Factual Background
On July 5, 1996 at approximately 1:00 p.m., Betty Jones, her mother and her brother went to the Super One grocery store in West Monroe to cash her mother's check and purchase groceries. After obtaining a shopping cart, Ms. Jones entered the store and slipped just inside the automatic doors that led into and out of the store. Jones testified that as she stepped on the mat and slipped, it was wet and a dark liquid "gushed out of the side."
Jones testified that as she fell, she tried to break her fall but was unable to do so; she fell to the floor, striking her head and landing with her left arm folded under her. Jones laid on the floor momentarily and was helped up by her brother and a female store employee who led her to a bench where she sat for about 5-10 minutes to recover from the fall. Jones testified that she saw no wet floor signs in the area where she fell.
Ron Oran, the store manager, approached Jones after her fall. Jones testified that Oran called a young male employee to the front of the store and told him to mop up a spill that "this lady fell in because of you." At trial, however, Oran denied ever making that statement. Jones denied ever filling out a report of the fall at the store.
Jones claimed that immediately after the fall, she felt numb on her left side and noticed that her clothes were wet on the left side. She went to the hospital emergency room the next day because her left hand and her head still hurt. Her subsequent CAT scan and an X-ray were both unremarkable and she was instructed to take Aleve for the pain. While the pain eventually disappeared, it was replaced by a numbness and tingling in her hand and leg.
Eight months later, beginning on March 3, 1997, Jones sought treatment from Dr. George R. Woods, an expert in family practice, complaining of pain in her left knee, wrist and hand. Woods examined her and determined that Jones' complaints were mostly subjective complaints of numbness and tingling. Woods prescribed mild anti-inflammatories and scheduled her to return in 5-7 days.
On March 12, 1997, when she again complained of decreased strength in her left *203 wrist and fingers, Dr. Woods sent Jones to Glenwood Medical Center for a nerve conduction study. The study showed that Jones suffered from carpal tunnel syndrome in both wrists but that it was worse in her right wrist than her left wrist. Based on the results of the nerve conduction study, Dr. Woods believed that Jones might require a carpal tunnel release for the median nerve and referred her to seek further treatment from an orthopedic surgeon. In his deposition, Dr. Woods opined that based on Jones medical history and the facts given to him by the plaintiff, that her carpal tunnel syndrome could have been associated with the fall.
At trial, Jones testified that she still experiences pain, tingling and numbness in her wrist and continues to take pain medication prescribed for her by Dr. Ballard, an orthopedist at the Green Clinic in Ruston. Ballard, however, did not testify at the trial of this matter and no medical records documenting his treatment of Jones were introduced into the record.
Two months prior to her fall at the Super One, Jones slipped in some chicken grease while employed as a cook with the Department of Corrections. She was able to stop herself from completely falling down by grabbing onto the sink with her left hand. Following that fall, she sought treatment in the emergency room for pain in her left hand and knee. When she was questioned about previous falls in deposition for the instant case, she failed to mention the earlier fall at the Department of Corrections. When confronted with this omission at trial, Jones admitted that she had fallen but claimed to have forgotten about it when asked during deposition.
Willis Newton, Jones' brother, testified on her behalf. At trial, Newton testified that Jones was behind him as they entered the store and that he was somewhat distracted, but turned to see he saw her fall when he heard someone holler that she was falling; he tried to catch her but was unable to do so. Newton also testified that he helped Jones up from the floor and noticed that it was damp. This testimony appeared to differ from that given at an earlier deposition where he claimed that he did not see Jones actually fall and his position relative to Jones was uncertain.
Several store employees also testified at trial. Norma Lowery, the front end manager, saw Jones come into the store through the exit door and fall down. In describing Jones' fall, Lowery testified that Jones did not fall forward, but "sat down" on the floor on her rear end. Lowery went over and helped Jones up from the floor and over to a bench to recover from the fall.
Lowery was unsure whether the area of the floor where Jones fell was wet or had just been mopped, but she did see yellow caution signs in the area warning patrons about a wet floor. After she helped Jones to a bench, Lowery contacted the store director about the fall. Lowery testified that she then left the scene and did not help Jones fill out an accident report about the fall.
Ron Oran, the store manager of the Super One, testified that entering the store requires customers to step onto a mat that would activate an electronic door opener. Since this was the busiest area of the store, it was cleaned three or four times a day. Store policy at the time of Jones' fall required a member of management to inspect the floors of the store every hour.
Oran also testified that the front end manager was responsible for inspecting the area near the doorway. The floors would be swept three or four times a day and then mopped, by the store's utility clerks, whenever a spill occurred. In addition to management checking for spills, the store's utility clerks were also expected to check for spills and clean them if found.
Concerning Jones' accident, Oran testified that as soon as he was notified that a fall had occurred, he went to the front of the store where he saw Jones sitting on a *204 bench. He noticed that the floor near the front of the store had been recently mopped and that there were wet floor signs in the entrance of the store that, in his opinion, one should have been able to see upon entering the store. Despite Lowery's testimony to the contrary, Oran testified that he had Lowery help Jones fill out an accident report while he returned to his duties. No report, however, was introduced at trial, and Jones denied filing one out.
Finally, Brad Kelly, the utility clerk on duty, testified that approximately 30 to 15 minutes prior to Jones' fall, he was called to clean up a big liquid spill on and around the in-and-out mat, but no management personnel inspected his work. Later, he was recalled back to the front of the store by Oran who asked him if he had just mopped up a spill. Kelly replied "yes" and then Oran told him that there was still some liquid on the floor that needed to be mopped up because a woman had just slipped and fallen in it. Kelly noticed that liquid had "squished" out from under the mats, which were bolted to the floor, onto the tile floor next to the mats, and that the mats were sticky. Kelly testified that there were wet floor signs placed next to the mats that patrons could see upon entering the store.
In an attempt to impeach Jones' testimony, Vicki Nixon, Hartford Insurance Company's Claims Services Manager, played for the court a recorded statement given by Jones about her slip and fall to claims adjuster, Roy Anderson, on July 22, 1996. In this statement, Jones stated that she was just inside the supermarket doors on the rubber mat when she slipped. She believed that the area had recently been mopped with a wet mop only and she admitted that there was a wet floor sign out near the entrance doors which she saw as she entered the store.
Brookshires next presented the testimony of their Risk-Safety Coordinator Kenneth Reynolds, who is responsible for everything pertaining to safety for both the customers and the employees in the retail stores. He tested the mat on which Jones slipped and was unable to make himself slip and fall or lose traction. In addition, Reynolds testified that he had no knowledge of any other person previously slipping and falling on these entrance mats.
The defendant's last witness was Dr. Randolph Taylor, an orthopedic surgeon who conducted a physical examination of Jones, took X-rays and then reviewed her previous medical records. During this exam, Jones continued to complain of tingling in her left hand and pain in her left knee. Jones also failed to inform Dr. Taylor of her previous slip and fall while employed as a cook at the Department of Corrections.
Dr. Taylor testified that he performed a hand grip test and opined that he believed that Jones was trying to mimic weakness because her grip strength was not consistent. He equated this with someone who was not exerting full effort while performing the test.
Taylor opined that Jones suffered from carpal tunnel syndrome in both her right and left wrists, but he did not attribute this condition to her fall at the Super One. Instead, Taylor believed that Jones had a long standing problem that originated from a systematic disease and would have developed in both wrists even if Jones had not fallen. Additionally, Taylor believed that Jones' complaints of knee pain were actually attributable to arthritis because she simply complained that the whole knee hurt rather than just a specific area.
Following the presentation of evidence, the trial court rendered judgment finding Jones to be 50% at fault and Brookshire to be 50% at fault, awarding $4,000.00 in general damages and medical expenses of $2,520.15. Jones' actual award, after the deduction of her percentage of fault, was $3,260.08. Brookshire now appeals, urging four assignments of error: that the trial court erred in finding that the liquid spilled on the floor created an unreasonable *205 risk of harm to Jones in light of her testimony that she slipped on the mat rather than the floor; that the trial court erred in finding that Brookshire had actual or constructive knowledge of a condition that caused Jones to slip; that the trial court erred in finding that Brookshire did not act reasonably; and finally, that the trial court abused its discretion in its award of general damages.

Applicable Law
La. R.S. 9:2800.6 B states:
B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.
(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.
It is well-settled that an appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, 92-1328 (La.4/12/93), 617 So.2d 880; Rosell v. ESCO, 549 So.2d 840 (La.1989). In fact, "where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, supra; Housley v. Cerise, 579 So.2d 973, 977 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong but whether the fact finder's conclusion was a reasonable one in light of the record evidence. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305; Stobart, 617 So.2d at 882-883.

Discussion
Brookshire does not contest the court's finding that liquid was spilled on the floor rather, by its first assignment, Brookshire urges that the trial court was plainly wrong to find that the liquid on the floor created an unreasonable risk of harm, in light of the plaintiff's own testimony that she actually slipped on the mat, not the floor. According to Brookshire, all the evidence shows that a small amount of liquid was present between the mats, or around the edges of the mats, and oozed out under the pressure of footsteps; however, no evidence shows that any slippery fluid was present on the mat, where she slipped. Thus Brookshire contends that Ms. Jones failed to show both an unreasonable risk of harm and causation, R.S. 9:2800 B(1) and (2).
Initially, we note that the statute requires a finding of an unreasonable risk "on the merchant's premises." Both the floor and the mat were on the premises. While the trial court may have stated in oral reasons that the hazard was on the floor, we have examined the record to see whether it supports a finding of a hazard either on the floor or the mat.
Admittedly, both the utility clerk, Brad Kelly, and the plaintiff herself testified that liquid would "squish out" from under the sections of the mat to which pressure was applied. However, Ms. Jones testified that when she fell on the mat, her clothing got wet; this suggests that some moisture was present on the mat as well or that she actually fell partially on the mat and on the floor. If there was sufficient liquid under the mat to seep out under pressure, the trial court was entitled to find sufficient moisture could have been tracked *206 onto the mat by customers, particularly in light of Oran's testimony that an estimated 22,000 customers traversed that area each week. Further, Kelly testified that the mat itself was sticky, presumably from liquid which had been "squished" from under the mat he previously mopped up. In short, we detect no manifest error in the finding that some liquid was present on the mat or floor where Jones slipped and fell. As such, the court reasonably ruled that the wet area created an unreasonable risk of harm for Jones. In fact, contrary to Brookshire's assertions in brief, the court specifically found that some liquid substance was on the mat itself. Since these findings are supported by the record, they cannot be in error. This assignment lacks merit.
In the alternative, Brookshire argues by its second assignment of error that even if the mat created an unreasonable risk of harm, store employees did not have the requisite degree of actual or constructive notice of this condition in order to impose liability. Specifically, Brookshire urges the evidence does not meet the temporal requirement of White v. Wal-Mart Stores Inc., 97-0393 (La.9/9/97), 699 So.2d 1081, to impute constructive notice to the store under R.S. 9:2800.6 C(1). We disagree, for as the district court, a finding of actual notice is supported in the record.
The record shows that more than one store employee had actual knowledge of the spill that had occurred mostly on the mat and also on the floor near the entrance. Although Kelly mopped it up, he acknowledged that the area was still wet some 15-30 minutes later when Ms. Jones fell. Kellywho is described by Brookshire in brief as one of the store's best utility clerksalso testified that he was well aware that liquid could seep under the mats and "squish out" when people stepped on them. This is the area where Jones fell. In short, the record will support the trial court's finding that Brookshire had actual notice of the hazard. Since a trial court's findings of fact may not be set aside on appeal in the absence of manifest error or unless they are clearly wrong, this assignment is without merit.
Also in the alternative, Brookshire argues by its third assignment of error that it utilized reasonable care to ensure that its premises were reasonably safe, thus satisfying R.S. 9:2800.6 A. Their argument is that the supervisor, Oran, promptly noticed the spill in the entrance area and assigned Kelly to clean it up. Kelly performed this duty properly, thoroughly, and according to instructions, first mopping with a wet mop and then touching up with a dry one. A "wet floor" warning cone was placed between the two mats. In short, Brookshire urges, there was nothing else that anyone could reasonably do to clean up the spill and warn patrons of the floor that was damp from mopping.
The trial court, however, stated that Brookshire failed to "completely make sure there was no substance underneath because the aluminum strips were nailed down." The court suggested that simply mopping was not a reasonable precaution when liquid can be trapped under the mats. On this record, we cannot declare the trial court plainly wrong. Although Kelly stated that he put out a wet floor cone near the area where he mopped the mats, the trial court was convinced that even if wet floor signs were present, they did not adequately warn Jones of the hazardous condition given the circumstances. This finding is certainly reasonable and supported in the record; specifically, Jones' height, that she was pushing a shopping basket, and the placement of the cone coupled with her testimony that she did not see it. Moreover, the court apparently took the warning cone into account when it assessed 50% of the fault to Jones. The trial court's finding that Jones satisfied the requirements of R.S. 9:2800.6 is not manifestly erroneous.

Damages
Brookshire next contends that the trial court's award of $4,000 in general *207 damages is excessive, urging that if Jones is entitled to any recovery, the maximum amount should be $1,000. We disagree.
Before an appellate court can question a trial court's award of damages as excessive, the reviewing court must look first, not at prior awards, but at the individual circumstances of the case. The discretion vested in the trier of fact is great, and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when an award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that an appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
If an articulated analysis of the facts discloses such an abuse of discretion, then examination of prior awards in similar cases is proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. Dixon v. Tillman, 29,483 (La.App.2d Cir. 5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174; Higginbotham v. Ouachita Parish Police Jury, 513 So.2d 537 (La.App. 2d Cir.1987). Whether an award is excessive depends upon whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact; likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. Manuel v. State Farm Mut. Auto. Co., 30,765 (La.App.2d Cir. 8/19/98), 717 So.2d 277; Reck v. Stevens, 373 So.2d 498 (La. 1979). To be an abuse of discretion and excessive, an award must be so high in proportion to the seriousness of the injury that it shocks the conscience. Payton v. New Orleans, 96-0109 (La.App. 4th Cir.06/26/96), 679 So.2d 446.
In the present case, the trial court found that although Jones had injured her knee and wrist in a previous slip and fall while employed as a cook at the Louisiana Department of Corrections, she aggravated those injuries in her slip and fall at the Super One and this aggravation lasted for approximately six-eight weeks.
A victim is entitled to compensation for an aggravation of a preexisting condition or injury. Tobin v. Wal-Mart Stores, Inc., 575 So.2d 946 (La.App. 2d Cir.), writ denied, 580 So.2d 923 (La.1991). Where a defendant's negligent action aggravates a preexisting injury, he must compensate the victim for the full extent of the aggravation. Cook v. Wal-Mart Stores, Inc., 540 So.2d 1017 (La.App. 2d Cir.1989). The primary considerations in the assessment of damages are the severity and duration of the injured party's pain and suffering. Tobin, supra. Based on the aggravation, the trial court awarded Jones $4,000.00 in general damages, which was certainly within his discretion.
As such, after our careful review of the record, we cannot say that the general damage award in this case is abusively high. While Brookshire makes this assertion, it provides no authorities to support this contention.
Further, Brookshire contends that Jones should not receive medical expenses for treatment received outside of the six-eight week period of aggravation that the trial court found. Medical expenses are a proper item of damages. Thames v. Zerangue, 411 So.2d 17 (La. 1982); Chambers v. Graybiel, 25,840 (La. App.2d Cir.06/22/94), 639 So.2d 361, writ denied, 94-1948 (La.10/28/94), 644 So.2d 377. While the award of the expenses for *208 treatment by Woods eight months after the accident appears to be inconsistent with the trial court's oral reasons that Jones' injury was a six-eight week aggravation, a tortfeasor is required to pay for the cost of overtreatment or unnecessary medical treatment, unless the overtreatment was incurred in bad faith. Bass v. Allstate Ins. Co., 32,652 (La.App.2d Cir. 1/26/00), 750 So.2d 460, 468; Boggs v. Voss, 31,965 (La.App.2d Cir. 6/16/99), 741 So.2d 139. Since there is nothing in the record to suggest that these expenses were incurred in bad faith, the trial court did not abuse its discretion in awarding these medical expenses. The award of medical expenses is therefore affirmed.

Decree
For the reasons expressed above, the judgment of the trial court is hereby affirmed. Costs of this appeal are assessed to Brookshire.
AFFIRMED.